Kenneth **KENLEY**,
Defendant–Appellant,

v.

**STATE** of Missouri,
Plaintiff–Respondent.

Nos. 15022, 15024.

Missouri Court of Appeals,
Southern District,
Division Two.

Sept. 7, 1988.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Sept. 27, 1988.

Application to Transfer Denied
Nov. 15, 1988.

Henry B. Robertson, Asst. Public Defender, St. Louis, for defendant-appellant.

William L. Webster, Atty. Gen., Jeffrey Philip Dix, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

PER CURIAM:

Following jury trial appellant was convicted of capital murder and received the death penalty. The conviction and sentence were affirmed on appeal. *State v. Kenley*, 693 S.W.2d 79 (Mo. banc 1985), cert. denied, 475 U.S. 1098, 106 S.Ct. 1500, 89 L.Ed.2d 900 (1986). In a separate trial appellant was convicted of three counts of robbery in the first degree, two counts of kidnapping, two counts of assault in the first degree and one count of stealing. These convictions were also affirmed on appeal. *State v. Kenley*, 701 S.W.2d 185 (Mo.App.1985), cert. denied, 475 U.S. 1098, 106 S.Ct. 1500, 89 L.Ed.2d 900 (1986).

Appellant thereafter sought post-conviction relief by filing two Rule 27.26 motions. They were consolidated for hearing and after the hearing the trial court made findings of facts, conclusions of law and en-

tered judgment denying the motions. This appeal is still governed by Rule 27.26 as the sentences were pronounced and the motions filed before January 1, 1988. Rule 29.15(m). This court has jurisdiction of the appeal. *Mercer v. State,* 666 S.W.2d 942, 944 (Mo.App.1984).

Appellant has briefed seven assignments of error, all alleging the ineffective assistance of counsel both at the capital murder trial and at the robbery, kidnapping, stealing and assault trial (hereinafter the "non-capital trial"). Our primary inquiry is whether the record reveals that (1) trial counsel failed to exercise that degree of skill, care and diligence to be expected of a reasonably competent attorney under similar circumstances, and (2) appellant was prejudiced by trial counsel's performance. *Strickland v. Washington,* 466 U.S. 668, 693, 104 S.Ct. 2052, 2064–65, 80 L.Ed. 2d 674 (1984), rehearing denied, 467 U.S. 1267, 104 S.Ct. 3562, 82 L.Ed.2d 864 (1984); *Seales v. State,* 580 S.W.2d 733, 736 (Mo. banc 1979); *Bannister v. State,* 726 S.W.2d 821, 824 (Mo.App.1987), cert. denied, —— U.S. ——, 107 S.Ct. 3242, 97 L.Ed.2d 747 (1987). The required prejudice is shown if the record reflects a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland v. Washington,* 466 U.S. at 694, 104 S.Ct. at 2068. With this in mind, we shall examine appellant's contentions and review the facts of record as the need arises.

Appellant first assigns error to the hearing court in finding there was no ineffective assistance of counsel because of counsel's alleged failure to investigate and present psychiatric evidence which appellant contends could have resulted in life imprisonment. He claims the court's finding that there was a viable "strategic decision" not to seek out this mitigating evidence was clearly erroneous. The evidence which appellant proclaims could reasonably have persuaded a jury to impose a life sentence instead of the death penalty consists of the testimony of two persons: Dr.

Maria Manion, a medical doctor specializing in child psychiatry, and Lois Crownover, a retired school social worker at the Poplar Bluff public school system where appellant attended school until he was 15 or 16 years old. Appellant asserts that these witnesses could have provided testimony and evidence concerning his genetic background, turbulent and abused family history, and psychiatric record including evidence that his condition was capable of improvement.

Ms. Crownover first became acquainted with appellant when he was eleven years old when his school principal had asked her to intervene. At that time appellant was having "great difficulty getting along" and was "overly aggressive, hostile, and was not functioning in the classroom." Upon those observations, she made her initial referral to the diagnostic regional center in Poplar Bluff, Missouri. Thereafter, appellant was hospitalized twice in Farmington State Hospital and once in Lutheran Hospital, upon the basis of Ms. Crownover's referral.

Appellant had been living with his father and grandmother. He was "extremely overly active" and his father described episodes of his fainting. After being evaluated at the diagnostic clinic initially, though not seen by a psychiatrist, appellant returned to school and Ms. Crownover was given instructions as to how to work with him. Ms. Crownover described some of appellant's problems: he was, at age eleven, still enuretic (a bed wetter), he was not achieving to the full potential revealed by his intelligence scores, and he would go into "wild rages", screaming, crying and kicking. Finally, at age fifteen, the school principal asked the Farmington Hospital to declare that appellant required homebound teaching because he was fearful for the safety of the teachers and other children. A homebound teacher was assigned to him. Thereafter, appellant was placed in a school for severely behavioral disordered children, but that alternative was unsuccessful and Ms. Crownover eventually referred him to Dr. Maria Marion who hospitalized him at the age of sixteen in the Lutheran Hospital in St. Louis.

While appellant was under Ms. Crownover's counselling, he was taking medication, prescribed by the Farmington Hospital, which restored some measure of self-control. Ms. Crownover described the relationship between appellant and his father as "angry" and the only way his father could control him (as a child) was through creating fear in him, but this became unsuccessful as appellant grew older. Appellant's father was an extremely nervous man who was illiterate, and suffered a severe speech impediment. Movant's grandmother, in her seventies, "adored Kenneth" and "did everything that she could in her power for him", though Ms. Crownover suspected appellant abused her as well as his father.

The office of appellant's criminal trial counsel requested from Ms. Crownover documentation of her involvement with appellant. These documents described appellant's behavior, his social history, the referrals made, and his various problems. Ms. Crownover sent the documents to the attorney's office, along with Dr. Manion's address. Thereafter, trial counsel contacted her, relating that he had received the documents, that the information gave him insight into his client, and that he appreciated her cooperation. She was not contacted by the attorney or his office again. At the time of trial Ms. Crownover's reports were at least six years old. Ms. Crownover also sent documentation of her involvement with appellant to the Fulton State Mental Hospital when Dr. Parwitaker was performing a psychiatric evaluation of appellant to determine mental defect per Chapter 552, RSMo, 1986.

Dr. Maria Manion admitted appellant to Lutheran Hospital on November 24, 1975, and discharged him on February 23, 1976. Throughout this time Dr. Manion was involved in psychiatric-psychological studies of appellant. She prescribed an antidepressant drug for appellant, commonly used in the treatment of mentally ill patients, and he responded favorably to it. During his hospitalization appellant was subjected to a variety of tests, including an electroencephalograph (EEG) (a recording of the electricity the brain produces), the results of which were abnormal. Dr. Manion said that the brain pattern could be altered due to many factors and that an EEG is not conclusive as a diagnosis of brain abnormality. The abnormal EEG was consistent with appellant's developmental delays, such as his enuresis, and his "temper tantrums". In a medical report, the doctor cautioned that "the findings were not conclusive or correlated with a convulsive disorder".

Dr. Manion remarked on appellant's genetic background and noted that his father had a chronic mental illness for which he had been hospitalized several times. Predisposition (genetics), an abnormal EEG, enuresis, and a non-nurturing environment indicated the genesis of appellant's violent temperament. However, there was never an indication that appellant was abused at home. Dr. Manion's opinion was that appellant was unable to cope with frustration and stress. She expressed the opinion that, if he had continued treatment, appellant "would be improved". Dr. Manion was never contacted by appellant's criminal trial attorney or his office.

After receiving the documentation of appellant's psycho-social history from Ms. Crownover, the attorney requested the court to order a mental examination be conducted at Fulton State Mental Hospital. The examination was so ordered and subsequently performed. After he received the report from Dr. Parwitaker at Fulton, the attorney spoke with Dr. Maria Wiscowski for approximately six hours about different aspects of the case and appellant's behavior. From the second week in January until the trial in June, the attorney was in daily contact with appellant and was alert to any abnormalities which might signal the need for another mental examination.

The attorney testified that he did not utilize Ms. Crownover as a witness in the sentencing phase because he believed Dr. Parwitaker's report to be fairly conclusive and damaging to the case. If he had called Ms. Crownover to testify, her six-year-old information could be refuted based on the much more recent report of Dr. Parwitaker and the state "would try to cut that to ribbons". The attorney said he did not

utilize Dr. Manion's testimony, for substantially the same reasons.

While working with appellant on the case, the attorney observed him to be "very coherent" and exhibited no erratic behavior. They discussed the possibility of appellant pleading not guilty by reason of mental disease several times, but appellant rejected that notion and, in any event, the attorney did not "feel that that defense would fly". Moreover, several psychologists' reports were very damaging to the case, bringing to light assaults on both his parents and grandmother, as well as assaults on other classmates and discipline problems throughout his life. Dr. Parwitaker's report specifically stated that appellant had no mental disease or defect. In fact, there was nothing in that new report by Dr. Parwitaker that had anything good to say about appellant. There was nothing in the report that the attorney thought helped with the case, as the report concluded that appellant knew and appreciated the nature and quality and wrongfulness of the alleged offense and was capable of conforming his conduct to the requirements of the law.

■ Appellant cites a variety of cases, which he contends support his argument. *Eddings v. Oklahoma*, 455 U.S. 104, 114–15, 102 S.Ct. 869, 876–77, 71 L.Ed.2d 1 (1982), is cited for the proposition that "The trier of fact must be permitted to consider any relevant mitigating factor, including a turbulent family history and emotional disturbance." The statute involved in that case was similar to our § 565.030.4, RSMo 1986, wherein evidence may be presented at the sentencing proceeding as to any mitigating or aggravating circumstances. In *Eddings*, the defendant produced evidence that he was 16 years old and that he had had an abused and turbulent family history and evidence of a psychiatrist and sociologist that the defendant was treatable. The trial judge mistakenly, as the United States Supreme Court found, believed he could not, as a matter of law, consider the evidence of the defendant's background and considered only his youth as a mitigating circumstance. The trial judge found that

the defendant's youth did not outweigh the aggravating circumstances proven by the state and sentenced the defendant to death. The Supreme Court remanded the case, instructing the state courts to consider what mitigating circumstances were presented, even though after consideration of that evidence and weighing the aggravating circumstances the court might come to the same decision. *Eddings*, 455 U.S. at 115, 102 S.Ct. at 877. This case does not stand for the proposition that the defense must present "mitigating" evidence without regard to the potential adverse effect on planned trial strategy.

Appellant cites *Holmes v. State*, 429 So. 2d 297 (Fla.1983), which was a capital murder case where the death penalty was imposed. The court found defense counsel ineffective because he failed to produce the reports of two court-appointed psychiatrists who suggested the defendant may have been in some kind of disturbed psychological state at the time of the murder. Though the court stated "A psychological disturbance at the time of a capital felony may be relevant in mitigation even though it is not sufficient ground for invoking the insanity defense", *Holmes*, 429 So.2d at 300, the instant case is obviously distinguishable. First, Ms. Crownover and Dr. Manion could not have testified as to appellant's disturbed state at the time of the murder, as their information was 6 to 11 years old. Second, in the present case, a psychological examination was made of appellant which concluded that he did not have a mental disease or defect. The record indicates that this examination was based in part on the documentation supplied by Ms. Crownover. In light of the fact that there was a conflicting report, only three months old, which revealed no mental defect and was contrary to the 6–year–old information appellant is complaining was not given to the jury, the cases are so dissimilar that *Holmes* is not persuasive.

Appellant also cites *Tyler v. Kemp*, 755 F.2d 741 (11th Cir.1985) (overruled on other grounds in 784 F.2d 1479, 1494 (11th Cir. 1986)), cert. denied, 474 U.S. 1026, 106 S.Ct. 582, 88 L.Ed.2d 564 (1985), for the proposition that it is ineffective assistance of coun-

sel to fail to investigate and present available mitigating character evidence. In *Tyler* the defendant was a woman sentenced to death for fatally poisoning her husband with parathion. No evidence was presented at sentencing. The court of appeals found defense counsel insufficient because he failed to produce mitigating evidence. The mitigating evidence omitted in *Tyler* was uncontroverted and unimpeachable:

> that Shirley Tyler had no prior criminal record, not even an arrest; that she had a good work record and used her earnings to help care for her family; that her husband was drunk and abusive at times and had knocked out some of her teeth when drunk; that she and her children moved away at one time because he drank and beat her; that on one occasion he put her out of the house in her night clothes; that she was a good mother, "crazy about her children," and kept them clean and cared for; that her character and reputation as wife and mother were good.

*Tyler,* 755 F.2d at 745. *Blake v. Kemp,* 758 F.2d 523, 534 (11th Cir.1985), cert. denied, 474 U.S. 998, 106 S.Ct. 374, 88 L.Ed. 2d 367 (1985), and *King v. Strickland,* 714 F.2d 1481 (11th Cir.1983), vacated 467 U.S. 1211, 104 S.Ct. 2651, 81 L.Ed.2d 358 (1984) reaffirmed, 748 F.2d 1462 (11th Cir.1984), are similarly distinguishable. *Pickens v. Lockhart,* 714 F.2d 1455 (8th Cir.1983), and *Clanton v. Blair,* 638 F.Supp. 1090 (E.D. Va.1986), cert. denied, —— U.S. ——, 108 S.Ct. 762, 98 L.Ed.2d 779 (1988), were both cases where counsel was found to be ineffective in failing to follow up information of an abused and turbulent family history with a psychological evaluation or an investigation into mitigating circumstances. That is not the case here.

Appellant cautions us that, to rationalize the failure to present the mitigating evidence at issue on grounds that it would have little impact "can hardly warrant the label of 'strategy' particularly where, as here, counsel's experience gives no reason

to suspect a deeper litigator's wisdom at work." [1]

Despite this sage advice, *Strickland* requires us to "... indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'"

*Strickland v. Washington,* 466 U.S. at 689, 104 S.Ct. at 2065. Moreover, the hearing court found the evidence was not adduced as a matter of trial strategy and we cannot disturb that finding unless the record reveals that it is clearly erroneous. Rule 27.26(j); *Tyler v. State,* 588 S.W.2d 3 (Mo. App.1979).

■ The psychiatric evaluation of appellant concluded that he did know and appreciate the nature and wrongfulness of his conduct and was capable of conforming his conduct to the requirements of the law. § 552.020, RSMo 1986. The sum of evidence which could have been adduced from witnesses Crownover and Manion was: that appellant had been aggressive, hostile and went into uncontrollable rages and had shown improvement only while on medication in an institution; that appellant grew up in a non-nurturing environment and had a violent and angry relationship with his father; that all attempts at control, help and treatment of him had proven futile; that Dr. Manion expressed the opinion that "treatment will facilitate adjustment, further adjustment"; and that the latest documentation by either witness was at least 6 years old.

The attorney was presented with a choice. Ms. Crownover and Dr. Manion could present two pieces of mitigating evidence: Movant's turbulent family history and his possible "further improvement" under treatment. If he put them on the stand, the rest of these witness' damaging testimony would also be available. In addi-

1. Appellant's criminal trial attorney was admitted to the Missouri Bar on September 17, 1983, began working for the Public Defender's office in Poplar Bluff in October 1983, and tried appellant's capital murder case on June 14 and 15, 1984. He had tried one case previously, on May 11, 1984, which involved armed robbery.

tion, Dr. Parwitaker's results of the psychiatric evaluation of appellant would be admissible to refute their testimony that movant was "disturbed" and "mentally ill". The language, that he did know and appreciate the nature and wrongfulness of his conduct and was capable of conforming his conduct to the requirements of the law, was potentially more damaging than the scant "mitigating" evidence available. Without evidence of the psychiatrist's (Dr. Parwitaker's) findings, it is not unreasonable to conclude that the appellant had a better chance at a life sentence than if those findings were adduced, even if the fact that appellant had an unhappy and turbulent life as a child were available to the jury. The court in *Porter v. State*, 682 S.W.2d 16 (Mo.App.1984), stated:

> "By the very nature of a criminal trial, a lawyer's function is a continuing judgmental process. Choices are constantly presented for one alternative action or another, often in a shifting factual situation with little or no time for reflective thought before decision is required. * * * Factors which influence those practical judgments are often subtle and not apparent on a cold record. * * * Likewise, in the setting of a criminal trial, the alternatives may be all bad."

*Porter v. State*, 682 S.W.2d at 19, quoting *Brame v. State*, 597 S.W.2d 665, 669 (Mo. App.1980).

■ The selection of witnesses to be called, like the introduction of evidence, is a question of trial strategy "and the mere choice of trial strategy is not a foundation for finding ineffective assistance of counsel." *Franklin v. State*, 655 S.W.2d 561, 565 (Mo.App.1983). Even if later shown to be wrong, a decision made as to trial strategy does not support a finding of ineffective assistance of counsel. *Porter v. State*, 682 S.W.2d at 18.

> "Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuc-

cessful, to conclude that a particular act or omission of counsel was unreasonable. (citation omitted)."

*Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065. The decision not to present mitigating evidence at the penalty phase is "well within the range of practical choices not to be secondguessed, if the decision is based on an informed and reasoned judgment." *Laws v. Armontrout*, 834 F.2d 1401, 1408 (8th Cir.1987).

■ Moreover, the record does not indicate that the choice not to offer the mitigating evidence was sufficient to undermine the confidence in the outcome of the trial. There were seven eyewitnesses to the murder and a total of 26 witnesses corroborated testimony regarding the weapon, clothes and identification of appellant. All the details surrounding the killing were related to the jury and the jury found two aggravating circumstances of the killing. Appellant has made no showing that there is a reasonable probability that a life sentence would have been given if Crownover and Manion were put on the witness stand. As discussed previously, some mitigating evidence could have been produced, but the risk that the other damaging testimony of those witnesses in addition to Dr. Parwitaker's report could damage the case to a greater extent reasonably justifies the nonproduction of that mitigating evidence. The record indicates it was just as likely that appellant would receive a death sentence without the mitigating evidence as it was with it. Point one is denied.

In his second point appellant asserts that counsel's inexperience denied him effective representation, and this inexperience was manifested in (1) conducting an ineffectual cross-examination of only a "handful" of state's witnesses, (2) failing to test eyewitness identifications, (3) failing to point out inadequacies in witnesses' descriptions of the cars involved, (4) failing to adequately develop the evidence militating against a finding of deliberation, (5) making only a perfunctory and futile closing argument, (6) failing to object to inadmissible testimony by Ronnie Felts' widow, and (7) failing

to object to testimony of appellant's possession of numerous unrelated handguns. We assume, although it is only collaterally mentioned in appellant's reply brief, that appellant is asserting that the alleged cumulative effect of multiple mistakes, such as that in *Harris v. Housewright*, 697 F.2d 202 (8th Cir.1982), should compel a reversal based on the allegation of ineffective assistance of counsel.

■ Appellant complains that the attorney cross-examined only eight of the state's twenty-six witnesses. At the hearing, the attorney explained his rationale was not to give the witnesses a chance to repeat their specific identifications and accounts of the events of the night. Appellant challenges the attorney's lack of ferocity in attacking the few inconsistencies in the witnesses' testimonies; to-wit: two of the six eyewitnesses to the murder remember appellant saying he would make "an example" out of them, in addition to consistently testifying to all other words spoken by the appellant; and the witnesses identified the cars driven by appellant in "vague" terms; and one witness only "thought" she could identify appellant.

The attorney explained at the motion hearing that he did not want to give any witness a chance to repeat damaging testimony. In any event, "the extent of cross-examination and the subjects covered must in virtually every case be left to the judgment of counsel." *Atkins v. State*, 741 S.W.2d 729, 731 (Mo.App.1987), quoting *Williams v. State*, 712 S.W.2d 404, 409 (Mo.App.1986).

Additionally, although every eyewitness testifying identified appellant unequivocally, except for one witness, appellant contends that he was deprived of effective assistance of counsel in the attorney's failure to impeach that one witness on her "equivocal" identification. The trial transcript reads:

Q. Can you identify the man that had the gun that evening?

A. I think so. Yes. Yes.

Q. Did you see him well enough that you can point him out to the jury?

A. Yes.

Q. Do you see him in the courtroom today?

A. Yes.

Q. Would you point out that man for the jury please?

A. It's the man sitting over there.

Q. Are you indicating the man with the blue shirt seated to the left of [appellant's attorney]?

A. Yes.

The record does show that, even in the face of overwhelming and accurate identifications, the attorney did attempt to undermine the identification testimony by questioning the lighting in the bar that night.

■ Appellant alleges the following were "vague" descriptions of the cars he drove during his escapade: "a Ford station wagon ... [b]rown and white ... an older car", "Brown station wagon ... in its seventies"; "brown Ford station wagon ... '67 model"; "1973 Ford Ranch Wagon ... bronze or brown or similar to that"; and with respect to the car appellant took from a patron of the Blue Moon, " '73 Ford Torino"; "gold Torino, Ford". These car descriptions are not vague nor are they necessarily inconsistent, particularly considering the independent basis of each witness' testimony.

There is no merit to these accusations. The question of impeaching a witness is a matter of trial technique and strategy and cannot be the basis of a breach of duty toward appellant. *Jackson v. State*, 540 S.W.2d 616, 617 (Mo.App.1976). Moreover, we find these "inconsistencies" minor at best and agree with the hearing court that appellant has not shown how he was prejudiced by not impeaching these witnesses. See *Hurd v. State*, 637 S.W.2d 809, 811 (Mo.App.1982).

■ Appellant next complains that the attorney failed to adequately develop evidence militating against a finding of deliberation. Evidence of deliberation was overwhelming. Appellant had possessed the gun two days prior to the crime spree; had purchased shells the day before, and utilized 15 rounds of ammunition in target practice with the gun; and had shot anoth-

er person in the back prior to entering the bar where he shot and killed Ronnie Felts. Even appellant admits that the attorney did make an attempt to show an absence of deliberation. On cross-examination of Richard Shirker, he elicited testimony that appellant "swung the pistol around", did not say anything, and fired the shot at Ronnie Felts. Then, during his closing statement, he developed this "scrap" of evidence in an attempt to convince the jury that what appellant did was not the deliberate and cool reflection required for a capital murder charge. Considering the facts in the record, it is difficult to see how the attorney's performance fell below that of a reasonably competent attorney and even if it did, in light of the overwhelming evidence otherwise, no conceivable prejudice resulted from the attorney's handling of the deliberation issue and appellant has shown none.

■ Appellant faults the attorney's closing argument as being "perfunctory and futile". Appellant does not develop this accusation in his brief or his reply brief; in fact no mention is made whatsoever as to why the attorney's closing argument was perfunctory or futile. It is not a requirement of a good closing argument that it be long, and length of the argument is no measure of its effectiveness. 2 Mo. Civil Trial Practice, § 14.38 (Mo.Bar 2d ed. 1988). A bare allegation of "futility" of closing argument, without reason or argument to support that accusation, will not be addressed on appeal. Rule 84.04(d).

■ Appellant also complains that the attorney failed to object to identification by the decedent's widow. Mrs. Felts identified as her husband the man pictured in previously-admitted Exhibit #3. Earlier, Exhibit #3 had been identified by a criminal investigator who photographed the victim at the Blue Moon. Mrs. Felts also mentioned she had two children. No mention of this was made on direct appeal or in either of the two Rule 27.26 motions tendered by appellant. We understand that appellant does not assert this "error" independently, but only as part of the alleged mass of cumulative attorney error which

he claims contributed to the ineffective representation. However, the only evidence that may have been inadmissible was that concerning the fact that the deceased had two children. *State v. Baublits*, 324 Mo. 1199, 27 S.W.2d 16, 19 (1930). In light of the overwhelming evidence against appellant, it is difficult to see any prejudice to appellant, considered alone or in conjunction with the rest of the alleged "inefficiencies" of the attorney's conduct of appellant's defense.

■ Appellant complains that evidence that he came to Lawrence Peal's house on January 1, 1984, with 17 handguns reached the jury. The objection was sustained as being unrelated to the crime and the state was directed to identify only the one weapon that was used. It is true that the attorney might have asked the court to strike the number of handguns from the record, but it is difficult to see how this omission prejudiced the appellant in any substantial way. The jury had already heard that appellant brought 17 handguns to the house. A motion to strike might just have drawn their attention to the number. Admittedly, the attorney's objection should have been made before the witness answered, but as a practical matter the answer may have come more quickly than expected or might have been unexpected. The record reflects the order in which the reporter took down the testimony and objections, it does not give us insight into whether or not the attorney attempted to object before the actual answer was given. The attorney stated the objection *and* grounds therefore in open court; the jury knew the impropriety of the introduction of that testimony.

Appellant bases his "cumulative effect of mistakes" argument on a case which reversed and remanded a life sentence on the grounds of ineffective assistance of counsel. *Harris v. Housewright*, supra. There, the two attorneys representing the defendant committed the following, which the court adjudged cumulatively amounted to ineffective assistance of counsel: (1) the two young attorneys were appointed by the court, but requested and received $500 from the defendant's family—no such im-

proper conduct is alleged in the present case; (2) although the heinous crime was well reported in the local papers, the attorneys, when requesting a change of venue, produced no witnesses to support their contention that the defendant could not receive a fair trial while the state produced seven witnesses; in the present case appellant specifically chose to waive venue because he wanted to stay in the county—a fundamental decision well within his own authority to make, *State v. Johnson,* 714 S.W.2d 752, 766 (Mo.App.1986); (3) during voir dire of the jury, the attorneys in *Harris* revealed jurors with strong biases in favor of the prosecution, yet did not exercise their peremptory challenges and did not challenge these jurors—in the present case, it is complained that the attorney failed to "reverse *Witherspoon*" the jury; however no allegation is made and none supported by the record that the attorney did not otherwise "prune" the prospective jurors down to an unbiased group; (4) the attorneys were not even aware of the witnesses the prosecution was calling or what their testimonies were to be, even though all the information was provided to them before trial—no such allegation can be made in the present case; (5) a major piece of evidence linking the defendant in *Harris* to the murder was introduced by testimony which was blatant hearsay, and the prosecutor even alerted the court to that fact, but the attorneys did not object to that fatal testimony—no such blatant or fatal errors can be found in the present record and the errors alleged by appellant on this appeal do not approach the proportion that this one in the *Harris* case does; (6) one gun allegedly stolen in the robbery was seized pursuant to a search warrant based on a false statement which, when omitted, casts serious doubt on the sufficiency of probable cause for the search of the weapon, yet the attorneys never questioned the validity of the affidavit other than through a general objection—no such claim is made here; (7) the prosecution presented an expert witness who gave testimony which was arguably contrary to the prosecution's theory of the case, but neither attorney impeached that testimony even though they had the report prior to trial—no such contradictory expert testimony existed in the present case; (8) the defendant's attorney in *Harris* opened up, on cross-examination, questioning on a very gruesome and prejudicial aspect of the case which allowed the prosecution to continue with the lead on redirect, over subsequent objection—no such grave error occurred in the present case and, in fact, the evidence at the hearing clearly showed an affirmative attempt by the attorney to evade that effect; (9) the attorneys did not object to the defendant appearing before the jury in shackles—here appellant was not compelled to appear in shackles in the present capital murder trial; (10) neither attorney for the defendant in *Harris* objected when the prosecutor commented on defendant's failure to testify or his own personal belief that defendant was guilty—no such egregious errors went unobjected to in the present case; (11) the attorneys failed to raise a known defense of potential merit—no accusation can be made in the present case.

Certainly the fact situation in *Harris* is clearly distinguishable from the present case, although appellant attempts to stretch the record to make the situations appear comparable. Even if cumulative errors, each insufficient in itself to be a constitutional ground for ineffective assistance of counsel, could be grounds for a new trial when their effect is viewed as a whole, Missouri has upheld situations probably more adverse to a defendant than the present. See *Parcel v. State,* 687 S.W.2d 621 (Mo.App.1985); *Neal v. State,* 703 S.W. 2d 570 (Mo.App.1986).

To establish ineffective assistance of counsel, appellant must show there is a reasonable probability that but for the attorney's unprofessional errors, the result of the proceeding would have been different. *Howard v. State,* 698 S.W.2d 23, 25 (Mo.App.1985). The only thing the attorney might have done was to point out the short length of time the eyewitnesses had to see appellant in the bar. Even if that were done, the evidence was overwhelming that, despite the shortness of time, each eyewitness was sufficiently sure and defi-

nite of his identification that what little impeachment that might have been done could have made little or no difference in the outcome. The majority of these "cumulative errors" made at trial were either reasonable in light of the circumstances or not prejudicial. When considered as a whole, their effect, even cumulative, is not such that it undermines our confidence in the outcome of the proceedings. The hearing court was not clearly erroneous in finding that no prejudice was shown to have resulted from failure to cross-examine, failure to object to the complained of evidence, or failure to develop an opening argument. The majority of these complaints have no support in the record, and even when viewed as to cumulative impact did not result in such prejudice as to justify a retrial. Therefore, the second point must be ruled against appellant.

Appellant's third point on appeal of his Rule 27.26 motion concerns his criminal trial attorney's failure to "reverse *Witherspoon*" the jury to ascertain whether they could consider a life sentence as opposed to the death penalty. Appellant also makes a one sentence assertion that the attorney did not ask about "the presumption of innocence and burden of proof", but appellant makes no argument on the claim and no clarification as to why that was error. With respect to these latter claims, since they were not presented to the hearing court in any of the Rule 27.26 motions nor raised at the hearing and since appellant has made no effort to argue the claims, we do not consider these alleged errors and will restrict our review to the "Witherspoon" issue.

The United States Supreme Court, in *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776, cert. denied, 393 U.S. 898, 89 S.Ct. 67, 21 L.Ed.2d 186 (1968), held that a juror may not be expelled for cause if he merely has general objections to the death penalty or expresses conscientious scruples against its infliction. *Witherspoon*, 391 U.S. at 522, 88 S.Ct. at 1777. The court's main concern was to prevent organization of a jury "uncommonly willing to condemn a man to die." *With-*

*erspoon*, 391 U.S. at 521, 88 S.Ct. at 17. The question to be answered on this appeal is whether failing to question veniremen as to whether they would automatically sentence a defendant to death (i.e., the reverse of the question required in *Witherspoon*) is necessary to a fair trial.

The hearing court found that all prospective jurors who were questioned stated they would base their decision as to whether or not to give the death penalty upon the facts and the law. This finding is supported by the record. Although a venireman who would automatically vote to impose a sentence of death upon a finding of guilt regardless of the circumstances *may* be challenged for cause, if the record reflects his assent to follow the court's instructions and a willingness to consider both penalties authorized for capital murder then no resultant error occurs in the non-removal of that venireman from the panel. *State v. Smith*, 649 S.W.2d 417, 425 (Mo. banc 1983), cert. denied, 464 U.S. 908, 104 S.Ct. 262, 78 L.Ed.2d 246 (1983).

In *State v. Mathenia*, 702 S.W.2d 840 (Mo. banc 1986), cert. denied, 477 U.S. 909, 106 S.Ct. 3286, 91 L.Ed.2d 574 (1986), a venireman unequivocally stated twice that he would automatically vote for the death penalty. The court, on appeal of the trial court's refusal to strike that venireman for cause, held that since he did not respond negatively to the question whether he would be able to follow the court's instructions, the trial court did not err in refusing to strike that venireman. *State v. Mathenia*, 702 S.W.2d at 843–844. In the present case, all the prospective jurors were asked if there was "[a]ny reason at all why you would not be able to follow the other instructions of the Court in this case?" No juror responded negatively, as was the case in *State v. Mathenia*, supra. Unlike that case, however, there was no indication of any death-prone veniremen, and the court's holding in *Mathenia* makes it clear that a venireman's willingness and ability to follow the court's instructions renders him competent to serve on the jury.

The trial court asked each juror whether he would be able to follow the

instructions of the case and failure to ask whether the veniremen would automatically favor the death penalty was not fatal to the acquisition of a fair jury. The trial attorney in failing to ask the "reverse *Witherspoon*" question did not fall below the standard of reasonable competence. A reasonably competent attorney might feel that as long as a venireman indicates he is able to follow the court's instructions, he would not be successfully challenged for cause and the attorney may reasonably conclude that the asking of the "reverse *Witherspoon*" question is not necessary to ensure a fair jury, in light of *Mathenia*.

The fact that the jury's assent to follow the court's instructions and the law came in the form of MAI–CR 2d 1.02 does not lessen the jury's resolve to act in conformity with that assent. Appellant asserts that, because counsel in *State v. Brown*, 547 S.W.2d 797 (Mo. banc 1977), had a right to inquire directly on voir dire about the burden of proof for self-defense, apart from the general instruction in MAI–CR 1.02 as to the burden of proof, failure to do so here requires reversal. The court in *Brown*, 547 S.W.2d at 799 held defense counsel had a *right* to so inquire because the burden of proof issue, unlike most affirmative defenses, is on the *state* in a self-defense case. The court did *not* say such an inquiry was *required*, over and above that made in MAI–CR 1.02.

In any event, no showing of prejudice has been made. The hearing court found that failure to ask the "reverse *Witherspoon*" question did not indicate any commitment of the jury to give the death penalty regardless of the circumstances. The record on voir dire, as well as testimony by jurors at appellant's Rule 27.26 hearing, indicate a willingness by all veniremen not otherwise stricken for cause to proceed to decide the case upon the court's instructions and with reference to the facts and law. That finding is supported by the record and cannot be deemed clearly erroneous. The point must be ruled against appellant.

Appellant next faults the attorney with another barrage of trial errors: (1) that he failed to submit or argue as a mitigating circumstance the fact that appellant's only prior conviction was a Class C felony for stealing; (2) that he failed to object to argument by the prosecutor; and (3) that the attorney made reference to the fact that appellant had not testified. It is appellant's contention that these errors, "taken together or in combination with the other errors noted in this brief" resulted in the ineffective assistance of counsel, requiring reversal of the death sentence.

One of the mitigating circumstances recognized in § 565.032.3(1), RSMo 1986, is that "[t]he defendant has no significant history of prior criminal activity". The trial transcript indicates that appellant was convicted of the Class C felony of stealing and sentenced to a term of four years in the Missouri Department of Corrections. The attorney had submitted that fact as mitigating evidence but withdrew it prior to the penalty phase. The prosecution then submitted that evidence for the jury's consideration. The attorney's confusion as to its submission is apparent from the transcript and belies the explanation he offered at the hearing that he did not offer it as a mitigating circumstance to keep the prosecution from "harping" on that conviction. The prosecutor made it known to the attorney that if he did not offer it as a mitigating circumstance, the prosecutor would offer it into evidence himself.

Even if the attorney should have submitted that mitigating circumstance, it is difficult to see how appellant was prejudiced. First, if appellant's concern is for the jury to know he only had one prior offense, that fact was brought out at trial. The fact that it was only a Class C felony of stealing was explicitly mentioned. Second, the instruction to the jury made them aware "You may also [in addition to the mitigating circumstance of age already submitted] consider any circumstances which you find from the evidence in extenuation or mitigation of punishment." The jury knew it could consider the lone prior offense in mitigation of appellant's punishment. No prejudice has been shown by

appellant to have resulted from this omission if it was such.

Appellant also claims that he was prejudiced by the prosecution's summation, which referred to a report not in evidence inferring the death penalty was an effective deterrent of crime. Appellant is critical that the attorney made no "effort to forestall or cure the error". The remarks were made in the following context:

What I want you to consider is what happened in this country and what has happened in this country over the last ten or fifteen years that we have not had—not instated the death penalty. What has happened to us?

You all have lived in our society during the last fifteen years. What's happened from the early sixties, the late fifties, to 1984? What happened in the years that we got soft on crime?

And I think you're going to have to agree with me, if you reflect at all, that our society has become a society where the cutthroats and the murders [sic] can do what they want.

And we read it so often in the paper that it doesn't even bother us any more. We see blood and gore every day on TV and our children see it and they think that that's what life's all about now.

Every man for himself. The man with the biggest gun wins. The man that shoots first wins and the losers are those people who are hurt and maimed and left lying dead on the floor.

Now you might ask, "Is that the state of conditions as a result of us not having the death penalty?" And you might say, "We've had the death penalty all along." But have we?

No. We have had individuals sentenced to death but there was not a conviction in this country since the late sixties until 1983. And what happened in 1983? What report came out about three days ago and showed us that violent crime dropped more than ten percent in 1983?

When this society decides to get tough on crime and when this society decides that punishment must be sure, then we will not have to live in fear in our society any more.

■■■■■ It is generally true that counsel should refrain from arguing matters not in evidence. *State v. Bailey*, 526 S.W.2d 40, 43 (Mo.App.1975). However, prosecutorial comment referring to facts not before the jury may be permissible, so long as it does not imply special knowledge of evidence pointing to defendant's guilt. *State v. Newlon*, 627 S.W.2d 606, 617 (Mo. banc 1982), cert. denied, 459 U.S. 884, 103 S.Ct. 185, 74 L.Ed.2d 149, rehearing denied, 459 U.S. 1024, 103 S.Ct. 391, 74 L.Ed.2d 520 (1982). Moreover, the prosecutor may comment on the prevalence of crime, the necessity of law enforcement to deter crime, and the evil results which might befall society if a jury fails to perform its duty. *State v. Hubbard*, 659 S.W.2d 551, 558 (Mo.App. 1983). The prosecutor's final argument may exploit legitimate inferences which the evidence yields and the law allows the prosecutor wide latitude for comment. *State v. Hodges*, 586 S.W.2d 420, 427 (Mo.App. 1979).

■■■■ With these principles in mind, we examine the competence of appellant's attorney in failing to object to that argument. Taken as a whole, the tenor of the prosecutor's argument concerned the effect of the death penalty on the deterrence of crime and the need to "get tough on crime". The incidental reference to "the report" was fleeting and was not dwelled on. The whole argument, despite the reference to the report, could rationally be taken as merely prosecutorial comment on the need for deterrence and the part the death penalty could play in reducing crime. Such argument is generally proper and counsel is not incompetent to fail to object thereto, although in retrospect it is easier for us to calmly examine the record and conclude an objection might have been made to the reference to the report not in evidence. See *Parcel v. State*, 687 S.W.2d 621 (Mo. App.1985). Objections "might" be made at any point during the trial, but for matters of trial strategy competent counsel might weigh the harms and conclude that objection is not worth the risk of alienating the

jury or highlighting the offensive comment. To this extent, we will not second guess trial counsel.

In any event, even if the attorney's failure to object to the offensive prosecutorial comment did fall below that expected of competent counsel, it is difficult to discern any resultant prejudice to appellant. Appellant certainly has not aided us in pointing out how he was prejudiced in light of the substantial basis upon which the jury had for otherwise determining the punishment required.

■ The last in appellant's trilogy of compound errors is the complaint that the attorney referred to the fact that appellant did not have to testify. The attorney stated:

"The defendant didn't have to testify in this case. Under Missouri law, no defendant does and the prosecutor can't say anything about that."

This remark is a far cry from arguing inferences from the fact that the defendant did not testify, which is the argument that is protected by the general rule which proscribes comment on such circumstances. The jury already knew that the defendant did not testify and it is difficult to reconcile that statement with any resultant prejudice. Prejudice might be easier to find if the remark were made during the guilt phase of the trial, but appellant's guilt had already been determined and the most that can be made of the remark at the penalty phase is that appellant should not be condemned to die merely because he did not testify.

The cases cited by appellant do not support the argument that the attorney's conduct fell below the commonly accepted standard or that prejudice resulted. In *Mullins v. Evans*, 473 F.Supp. 1321, 1323 (D.Colo.1979), the defense attorney literally did nothing, in addition to mentioning the fact that he had informed the defendant he could testify but that defendant chose not to. The court in *Mullins* found the defense attorney's conduct objectionable not on the basis of that lone remark, but because of his entire trial strategy, which was to let the jury convict the defendant of 1st degree murder, when the circumstances of the case clearly called for an argument for leniency. *Mullins*, 473 F.Supp. at 1323-1324. In two of the three Missouri cases the prosecutor commented upon the defendant's failure to testify and the inferences therefrom in the guilt phase of the trial. *State v. Chunn*, 657 S.W.2d 292, 295 (Mo.App.1983); *State v. Dupepe*, 241 S.W. 2d 4, 7 (Mo.1951). In *State v. Gray*, 503 S.W.2d 457, 461-462 (Mo.App.1973) the court commented upon the defendant's failure to testify. These prejudicial circumstances are not present in the present case.

■ Even viewed collectively, these alleged "cumulative" errors do not undermine our confidence in the verdict rendered, as required by *Strickland v. Washington*, 466 U.S. at 694, 104 S.Ct. at 2068. This was not a "close case"; the jury took a half an hour to reach a decision as to appellant's guilt and slightly over an hour to determine his penalty. The offensive remark and omissions brought to light by appellant, while not exemplary conduct of an attorney, were fleeting and relatively harmless considering the great weight of evidence which supports the jury verdict. Moreover, the guilt of appellant had already been decided and the remarks complained of and the failure to submit the mitigating circumstance of no serious prior offenses, as previously discussed, had little influence upon the penalty decided.

■ Appellant's next set of cumulative errors relate to his trial on robbery, kidnapping, assault and stealing charges. He claims that the hearing court did not make specific findings of fact and conclusions of law as required by Rule 27.26(i). Additionally, he claims the attorney incompetently represented appellant because (1) he conducted a brief and inadequate voir dire (2) asked only one question of one of 17 state witnesses (3) failed to object to inadmissible evidence and (4) waived closing argument. None of these claims were raised at appellant's Rule 27.26 hearing or in appellant's pro se motion. These issues were never presented to the hearing court and

its failure to make specific findings thereon cannot be error. See Rule 27.26(i).

■ As to the specific allegations of error, we have reviewed the record and found something missing: any meritorious argument for leniency. Just what the attorney should have done is not disclosed by appellant and we are left to examine over the record and discern what in the transcript supports his complaint. We find nothing. Appellant makes a general statement that the attorney did not object to some hearsay statements, but in our perusal of the record, we can find only one piece of hearsay evidence which did not fall within an exception and the attorney did make an objection which was promptly sustained by the trial court. The attorney did not "merely sit beside" appellant at trial. Numerous objections were made, some sustained, some overruled. In any event, trial counsel's failure to object to admission of evidence warrants post-conviction relief only if that failure deprives defendant of a fair trial. *Patterson v. State*, 625 S.W.2d 178 (Mo.App.1981). No such deprivation exists here.

As for cross-examination of the state's witnesses, the attorney's strategy in not questioning them was not a "tacit concession" of appellant's guilt; direct examination of those witnesses confirmed that. All the state's witnesses made a positive identification of appellant and each testified unambiguously to facts within his personal knowledge, except for one who testified to the hearsay statement objected to. The testimony was practically unimpeachable and the attorney made a thought-out tactical decision not to cross-examine these witnesses upon facts which were clearly ascertained and corroborated. That decision will not be second-guessed on appeal.

■ Appellant also would condemn the attorney's voir dire because it was "barely two pages long". The prosecution had already covered the issue of "reasonable doubt" and the judge had already inquired of the jury "If you are not so convinced [that defendant is guilty], you must give him the benefit of the doubt and find him not guilty." The attorney devoted the voir dire to previous knowledge of the case, relationships to the lawyers involved, the witnesses involved and the victims involved. Though this voir dire might have been more thoroughly developed, it is not so insufficient that it denied appellant a fair trial. Counsel's conduct fell within the range of acceptable practice.

■ Appellant's complaint that the attorney made no closing argument is meritless. He was not required to make any argument, opening or closing, and his decision in that regard is considered part of trial strategy. *Harroald v. State*, 438 S.W.2d 202, 204 (Mo.1969). An attorney's trial strategy will ordinarily not be questioned on review, particularly in light of the fact that the court in *Strickland* concluded that strategic choices are "virtually unchallengeable". *Strickland*, 466 U.S. at 690, 104 S.Ct. at 2066. We can find no exceptional circumstance to place this case outside the general rule. Nothing in the record indicates that the attorney's sense of hopelessness "distorted his professional judgment." *Strickland*, 466 U.S. at 699, 104 S.Ct. at 2070.

The attorney cannot be said to have deprived appellant of the right of an adversarial testing of the state's evidence. The evidence was overwhelming. Appellant did not want to call any witnesses and appellant did not want to testify. Appellant had discussed his decisions fully with the attorney and at trial appellant had no complaints with the attorney's representation or his decisions. These claimed "errors" alone or in combination do not rise to constitutional proportions required for post-conviction relief under Rule 27.26 and the point must be denied.

■ Appellant next challenges the attorney's failure to move to sever the occurrences charged at the Kater Inn, the Blue Moon Tavern and the Coachlight Motel. Appellant first claims that, because the trial judge made no specific findings of fact or conclusions of law, reversal for specific findings is necessary and required by Rule 27.26(i). The judge concluded his findings with, "While other complaints of ineffec-

tive counsel were raised, no evidence was produced indicating the defendant was prejudiced by the conduct of counsel." It can reasonably be concluded that the instant issue was considered by the judge and he specifically found that appellant failed his burden of proof to show prejudice; thus, we will review the record to determine whether the finding as to lack of prejudice was clearly erroneous. *Abrams v. State,* 698 S.W.2d 15, 17–18 (Mo.App. 1985); Rule 27.26(j).

Appellant alerts us that in 1984, Rule 23.05 permitted the state to join offenses "which are based on the same act or on two or more acts which are part of the same transaction or on two or more acts or transactions which constitute parts of a common scheme or plan...." Rule 23.05(a) (since revised). Appellant suggests the charges for which he was tried on November 14, 1984, fell into three groups: (1) the robbery of Kater Inn, the abduction of Sandra Buttry and the assault on her; (2) the robbery, assaults, kidnapping and car theft at the Blue Moon Tavern; and (3) the robbery of Ollie Gaultney at the Coachlight Motel. Appellant claims Rule 23.05 did not contemplate the joinder of these transactions since they are within neither the "same transaction" nor "common scheme or plan" rubrics.

Indicative of what our courts accept as charges based on a series of acts which are "part of the same transaction" is the scenario represented in *State v. Robinson,* 591 S.W.2d 18 (Mo.App.1979), where the defendant, after killing his victim, stole his car and fled; while in flight, he shot an officer trying to apprehend him. The court upheld the denial of severance. *Robinson,* 591 S.W.2d at 20. The court in *State v. Callies,* 588 S.W.2d 18 (Mo.App.1979), upheld the denial of severance where the defendant, tried on escape and robbery charges, had escaped from prison and thereafter demanded at gunpoint a car from another man in the area. *Callies,* 588 S.W.2d at 20.

■ In order to charge an accused with offenses in separate counts in one indictment under the "common scheme or plan",

those offenses must be the product of a single or continuing motive. *State v. Harris,* 669 S.W.2d 579, 581 (Mo.App.1984). In *State v. Allbritton,* 660 S.W.2d 322 (Mo. App.1983), the court found ample evidence of a common plan or scheme by the defendant to assault women. In *Allbritton,* the defendant, on the pretext of a fabricated story, forced his way into a woman's apartment and placed his knife against her throat, but fled when the apartment manager arrived. Shortly thereafter, he entered another woman's house, fabricated a story, and, using a knife, threatened, cut, robbed, raped and sodomized her and her daughter. The same knife was used on all victims, the Kool brand of cigarettes were identified by all the victims, the crimes occurred within the same vicinity and within a short time of one another. *Allbritton,* 660 S.W.2d at 327.

Similarly, the defendant in *State v. Couvion,* 655 S.W.2d 80 (Mo.App.1983) was spotted at the entrance of a Children's Zoo early on the morning that a zoo ranger found pry and scratch marks on the door entrance as well as a crack in the plexiglass ticket window. The defendant's fingerprints were found on the glass. The following morning the rangers found the ticket window at the zoo's entrance had been broken out, the door pried and the lock bent. A black leopard cub was found missing from her cage. On both mornings, a police officer noticed the defendant's car parked near the zoo. The court upheld the denial of a motion to sever because there was evidence of a common scheme or plan, "that is to say the offenses were products of a single or continuing motive. *State v. McCrary,* 621 S.W.2d 266, 271 (Mo. banc 1981)." *Couvion,* 655 S.W.2d at 82.

■ The present record provides ample evidence of a common scheme or plan. In all instances appellant announced, "This is a holdup", or similar words to that effect; he threatened each victim at each location with the same type of gun, identified by each eyewitness; he attempted to take a female hostage in each instance; in each case he demanded money from the cash register; on two of the instances he indi-

cated to his female hostages that he wished them to perform sexual acts; in two instances he instructed his victims to lie face down on the floor; and in all instances he had procured a stolen car for his getaway. There is ample evidence in the case to support the determination that the crimes prosecuted on November 1984 were all part of a common scheme or plan, as our courts have defined it in case law. Thus, a decision by the attorney not to make a motion to sever would not be unreasonable in light of the then-existing law which clearly indicates joinder of the charges was proper and a denial of the motion would be likely.

■ Moreover, it is difficult to imagine, even presuming the unlikely event that a motion to sever would be granted, how the result would have been any different. The state produced substantial, ample evidence to support each count of robbery, assault, stealing and kidnapping charge alleged, individually and without reference to the other evidence. Each eyewitness positively and without a doubt identified appellant as the perpetrator of the crimes. Each witness testified unambiguously to the facts and circumstances surrounding each charge. We realize it is generally true that evidence of other crimes is prejudicial if not necessary to prove the crimes charged and would be considered by the court in determining whether to sever the charges. However where, as here, the evidence is so overwhelming as to guilt for each charge, we cannot believe the result would have been any different.

■ Appellant must overcome a strong presumption of the attorney's competency at trial. *Jackson v. State*, 672 S.W.2d 367, 368 (Mo.App.1984). Appellant failed to overcome that presumption. In the present case, the incidents are intertwined with one another and easily appear to be "part of a common scheme or plan." Particularly in light of the fact that most of the evidence had previously been adduced at appellant's capital trial, the attorney knew in advance the substantial and overwhelming evidence to be produced on each count and could reasonably have concluded that a motion for severance would have been a futile and time-consuming effort. Furthermore, we

are not convinced that appellant would have had a better chance for acquittal on any of the charges in separate proceedings even if severance had been ordered, and appellant has not demonstrated how · he was prejudiced to the extent necessary for a constitutional violation of his right to effective counsel. This point is denied.

■ In his final claim of error, appellant attacks his criminal trial attorney's sufficiency of representation on the ground that he failed to request MAI–CR2d 3.60, instructing the jury to limit their consideration of substantial evidence of other crimes. Appellant also complains that the attorney did not remind the court to admonish the jury at recesses with MAI–CR2d 1.08.

MAI–CR2d 3.60 reads as follows:

If you find and believe from the evidence that the defendant was (involved in) (convicted of) (an offense) (offenses) other than the one for which he is now on trial (and other than the offense mentioned in Instruction No. ____), you may consider that evidence on the issue of (identification) (motive) (intent) (absence of mistake or accident) (presence of a common scheme or plan) ( [*specify other purpose for which the evidence was received as substantive evidence of guilt* ] ) of the defendant (and you may also consider such evidence for the purpose of deciding the believability of the defendant and the weight to be given to his testimony). (You may not consider such evidence for any other purpose.)

At the hearing on appellant's Rule 27.26 motions, the attorney explained his reasoning behind not requesting that instruction: "I knew that all it would serve to do would be to reiterate to the jury the evidence of the other crimes and I thought the less they thought about that the better." The attorney believed that instruction would allow the prosecutor to highlight the various ways the jury could use that evidence. The court in *Williams v. State*, 712 S.W.2d 404, 407 (Mo.App.1986), quoting *Love v. State*, 670 S.W.2d 499, 502 (Mo. banc 1984) stated: " '[a]n objectively reasonable choice not to submit an available instruction does not constitute ineffective assistance of counsel.' "

The attorney made a reasonable choice and will not be found to be ineffective on this ground. Moreover, we agree with the motion judge's conclusion that appellant has not demonstrated how this omission has prejudiced him. Since neither prong of the *Strickland* test is met, the attorney's representation will not be found to be ineffective on this ground.

Appellant does not show how he was prejudiced by the omission of MAI–CR2d 1.08, if it occurred, other than to point out that knowledge of his offenses was widespread in the community. Even then he fails to explain how the giving of MAI–CR2d 1.08 would rectify the existent knowledge to the extent that a different result may have been obtained. Hence, even if we assume, *arguendo*, that the attorney's failure to remind the court to give the instruction at the two recesses fell below the conduct expected of a reasonably competent attorney, appellant's complaint must fail because he had not met his burden of proving prejudice so substantial as to undermine confidence in the outcome of the trial. This point is denied.

The judgment is affirmed.

All concur.